No. 18        May 23, 2024        331

IN THE SUPREME COURT OF THE
STATE OF OREGON

William B. WALTON,
an individual;
James Jefferson WALTON, Jr.,
an individual; and
Victoria K. WALTON,
an individual,
*Petitioners on Review,*

*v.*

NESKOWIN REGIONAL SANITARY AUTHORITY,
*Respondent on Review,*

*and*

Evelyn A. HARRIS,
Trustee of the Harris Living Trust et al.,
*Defendants.*

(CC 17CV10996) (CA A168358) (SC S069004)

On review from the Court of Appeals.*

Argued and submitted November 29, 2022.

Paul J. Sundermier, Saalfeld Griggs PC, Salem, argued the cause for petitioners on review. Jennifer C. Paul filed the brief. Also on the brief was Paul J. Sundermier.

Christopher T. Griffith, Haglund Kelley LLP, Portland, argued the cause and filed the brief for respondent on review. Also on the brief was Joshua J. Stellmon.

Kathryn D. Valois, Pacific Legal Foundation, Palm Beach Gardens, Florida, argued the cause for *amicus curiae* Pacific Legal Foundation. Christina M. Martin filed the brief.

_____

\* Appeal from Tillamook County Circuit Court, Jonathan R. Hill, Judge. 314 Or App 124, 498 P3d 325 (2021).

Nicole M. Swift, Cable Huston LLP, Portland, argued the cause and filed the brief for *amici curiae* League of Oregon Cities, Association of Oregon Counties, and Special Districts Association of Oregon. Also on the brief were Clark I. Balfour and Nicole A.W. Abercrombie.

Before, Flynn, Chief Justice, and Duncan, Garrett, DeHoog, Bushong, James, and Masih, Justices.**

DUNCAN, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

** Balmer, J., retired December 31, 2022, and did not participate in the decision of this case. Walters, J., retired December 31, 2022, participated at oral argument, but did not participate in the decision of this case. Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case.

**DUNCAN, J.**

In 2017, petitioners on review (plaintiffs) filed a complaint asserting an inverse condemnation claim against respondent on review (defendant), a local sewer authority. An inverse condemnation claim is a claim that a property owner can bring for "just compensation" under the state and federal constitutions when a governmental entity or its delegate has taken the owner's property for public use without instituting condemnation proceedings.

Plaintiffs alleged that defendant had installed sewer lines on their property and that the installation constituted a "taking" for which they were entitled to "just compensation" under Article I, section 18, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution.[1] Defendant moved for summary judgment, asserting that plaintiffs' claim was time barred because it was not brought within the six-year limitations period established by ORS 12.080(3), which applies to claims "for interference with or injury to any interest of another in real property." According to defendant, plaintiffs' claim accrued when the sewer lines were installed, which was no later than 1995, and, therefore, the six-year limitations period expired in 2001, 16 years before plaintiffs filed their complaint.

In response, plaintiffs made three arguments. First, they argued that, because their takings claim was based on the takings clauses of the state and federal constitutions, it could not be subject to a statute of limitations. Second, they argued that, even if some types of takings claims— specifically, "regulatory" takings claims—can be subject to statutes of limitations, claims like theirs—which are "physical occupation" takings claims—cannot be. Third, they

---

[1] Article I, section 18, of the Oregon Constitution provides that "[p]rivate property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered[.]" The Fifth Amendment to the United States Constitution provides that "[n]o person shall *** be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fifth Amendment's Takings Clause applies to the states through the Fourteenth Amendment. *Dept. of Transportation v. Hewett Professional Group*, 321 Or 118, 131 n 7, 895 P2d 755 (1995) (citing *Nollan v. California Coastal Comm'n*, 483 US 825, 827, 107 S Ct 3141, 97 L Ed 2d 677 (1987)).

argued that, even if "physical occupation" takings claims can be subject to statutes of limitations and ORS 12.080(3) applies, the point at which their claim accrued was not when defendant installed the sewer lines, but instead when defendant affirmatively denied plaintiffs "just compensation," which, they alleged, occurred in 2014. Therefore, according to plaintiffs, the six-year limitations period did not expire until 2020, three years after they filed their complaint.

The trial court granted defendant's motion and entered a judgment dismissing plaintiffs' claim. Plaintiffs appealed, and the Court of Appeals affirmed. *Walton v. Neskowin Regional Sanitary Authority*, 314 Or App 124, 126, 498 P3d 325 (2021). On plaintiffs' petition, we allowed review. For the reasons we explain below, we hold that (1) plaintiffs' claim is subject to the six-year limitations period established by ORS 12.080(3); (2) given the facts of this case, plaintiffs' claim accrued when defendant installed the sewer lines; and (3) because plaintiffs did not initiate their claim within the six-year limitations period, it is time barred. Therefore, we affirm the Court of Appeals' decision and the trial court's judgment.

## I.   BACKGROUND

### A.   *Historical Facts*

When reviewing a trial court's ruling on a motion for summary judgment, we view the summary judgment record in the light most favorable to the nonmoving party, in this case, plaintiffs. *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 332, 83 P3d 322 (2004). Viewed in that light, the relevant historical facts are as follows.

Sometime before or during 1995, defendant, the Neskowin Regional Sanitary Authority, installed two sewer lines on property that belonged to plaintiffs' predecessor in interest, their father. According to plaintiffs, defendant "dug a trench in [the] front yard and installed and buried a main sewer line and a feeder line." Defendant did not have plaintiffs' father's permission to install the sewer lines, and it did not make any payments to plaintiffs' father when it installed the lines.

Three years after the sewer lines were installed, plaintiffs' father made an agreement with defendant about them. According to plaintiffs' complaint, "[o]n or around November of 1998," defendant told their father that it needed an easement for the sewer lines and their father granted defendant an easement "on the condition that" defendant provide "a free hook-up to the [sewer system] when required." But defendant "never prepared an easement document" and "never recorded an easement."

In 2014, defendant informed plaintiffs—who, by that time, had acquired the property from their father—that the property's septic system had failed and they needed to connect to the sewer system. Plaintiffs invoked the 1998 agreement and requested a free connection to the sewer system. In an April 2014 letter, defendant informed plaintiffs that it was denying their request.

B. *Procedural Facts*

In 2017, plaintiffs filed the complaint in this case, asserting an inverse condemnation claim against defendant. As explained further below, an inverse condemnation claim is a claim that a property owner can bring to obtain "just compensation" when a governmental entity or its delegate has taken the owner's property for public use without first initiating condemnation proceedings. *Dunn v. City of Milwaukie*, 355 Or 339, 347, 328 P3d 1261 (2014) (so holding with respect to "just compensation" under Article I, section 18, guarantees); *United States v. Clarke*, 445 US 253, 257, 100 S Ct 1127, 63 L Ed 2d 373 (1980) (so holding with respect to "just compensation" under Fifth Amendment guarantees).

In their complaint, plaintiffs alleged that defendant had installed the sewer lines on their property "without the legal acquisition of a part of the fee or an easement" over the property and that the installation of the sewer lines constituted a "taking." Plaintiffs further alleged that defendant is a "public sewer authority" with "statutorily delegated authority to use the state's power of eminent domain to acquire real property interests *** pursuant to ORS 450.815(4)" and that defendant had installed the sewer lines "for the public purpose of providing [defendant's] utility

services."[2] Plaintiffs asserted that, under Article I, section 18, and the Fifth Amendment, they were entitled to "just compensation," which "is, at a minimum, the value of the * * * hook-up" to the sewer system.

Regarding the timing of their complaint, plaintiffs asserted that, because they were making "a direct claim for compensation under both constitutions as a *per se* 'physical invasion or occupation' * * * no state statute or court rule can limit the time within which to bring an action for the remedy mandated by each constitutional provision." In other words, plaintiffs asserted that their claim could not be subject to a statute of limitations.

Plaintiffs' inverse condemnation claim was their only claim. Although plaintiffs alleged that defendant had made an agreement with their father for a free connection to the sewer system and that defendant had breached that agreement, plaintiffs did not assert a contract or quasi-contract claim.

In its answer, defendant admitted that it is a public sewer authority with the powers set out in ORS 450.815, that it had installed the sewer lines "on and under property near or on Plaintiffs' property" no later than 1995, and that, in 2014, it had informed plaintiffs that they needed to connect to the sewer system because the property's septic tank had failed. Defendant denied all the other allegations in plaintiffs' complaint, including the allegation that it had entered into an agreement with plaintiffs' father regarding the sewer lines. Defendant raised several affirmative defenses and counterclaims. As one affirmative defense, defendant asserted that, to the extent that plaintiffs were relying on an oral agreement between defendant and their father, the agreement was unenforceable due to the statute of frauds, ORS 41.580, which provides, in part, that an agreement for the sale of an interest in real property is void unless written and signed. As another affirmative defense, defendant asserted that plaintiffs had failed to file their claim within the applicable statutory limitations period.

---

[2] ORS 450.815(4) authorizes sanitary authorities to "[a]cquire by purchase, gift, devise, condemnation proceedings, or otherwise" real property necessary for the exercise of its powers.

Thereafter, defendant moved for summary judgment on the ground that plaintiffs' inverse condemnation claim was untimely. Defendant asserted that plaintiffs' inverse condemnation claim was subject to ORS 12.080(3), which establishes a six-year limitations period for actions "for interference with or injury to any interest of another in real property." For support, defendant relied on two cases in which courts applied ORS 12.080(3) to takings claims. The first case was *Suess Builders v. City of Beaverton*, 294 Or 254, 256, 268, 656 P2d 306 (1982), where this court applied ORS 12.080(3) to a "regulatory" takings claim in which the plaintiffs had alleged that the defendants had "temporarily deprived them of the rental value of [their] property and caused a permanent depression of its market value by designating the major part of the property as a future park site in the city's comprehensive land use plan." The second case was *The Foster Group, Inc. v. City of Elgin, Oregon*, 264 Or App 424, 441, 332 P3d 354 (2014), where the Court of Appeals applied ORS 12.080(3) to a "physical occupation" takings claim in which the plaintiffs had alleged that the defendant had constructed a road that encroached on their property.

Defendant asserted that there was no dispute about the facts relevant to its summary judgment motion, specifically, that plaintiffs had alleged an inverse condemnation claim based on the installation of the sewer lines, that the lines were installed no later than 1995, and that plaintiffs did not file their complaint until 2017. Defendant contended that the six-year limitations period began to run no later than 1995 and, therefore, expired in 2001, 16 years before plaintiffs filed their complaint.

Plaintiffs filed a response to defendant's summary judgment motion. They did not dispute the facts that defendant had identified as relevant to its motion, but they made three alternative arguments against the motion.

First, plaintiffs argued that, because takings claims are based on constitutional provisions, they cannot be subject to any statutory limits, including statutory time limits. They contended that "the legislature cannot pass statutes

that contravene the constitution, nor should the courts enforce [such] statutes[.]"

Second, plaintiffs argued that, even if some types of inverse condemnation claims, like the "regulatory" takings claim in *Suess Builders*, are subject to ORS 12.080(3), "physical occupation" takings claims are not. Thus, plaintiffs contended, *Suess Builders* was not controlling. They also argued that, although *Foster* involved a "physical occupation" taking, the parties in that case did not dispute whether the six-year limitations period under ORS 12.080(3) applied.

Third, plaintiffs argued that, even if "physical occupation" takings claims are subject to ORS 12.080(3), the statute's six-year limitations period does not begin to run until "the putative condemner refuses to pay just compensation after taking private property for a public use." Therefore, according to plaintiffs, the limitations period for their claim did not begin to run until defendant affirmatively denied plaintiffs "just compensation" in the April 2014 letter.

After a hearing, the trial court granted defendant's summary judgment motion. The trial court held that plaintiffs' claim was subject to the six-year limitations period established by ORS 12.080(3) and that it accrued when the sewer lines were installed, which was no later than 1995. Therefore, the six-year limitations period expired in 2001, 16 years before plaintiffs filed their complaint in 2017. The trial court entered a limited judgment dismissing plaintiffs' inverse condemnation claim.[3] It later entered a supplemental judgment with a money award in defendant's favor.

Plaintiffs appealed both judgments. On appeal, the parties renewed the arguments they had made in the trial court. The Court of Appeals affirmed on the ground that,

---

[3] Although plaintiffs' inverse condemnation claim was their only claim, defendant raised counterclaims. The trial court's limited judgment dismissing plaintiffs' claim was authorized by ORCP 67B, which provides, "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, *** the court may render a limited judgment as to one or more but fewer than all of the claims[.]" The limited judgment resolved plaintiffs' claim and made it possible for plaintiffs to appeal the trial court's summary judgment ruling while the parties continued to litigate defendant's counterclaims, which they did for a time before agreeing to stay the proceedings pending resolution of plaintiffs' appeal.

as the trial court had concluded, plaintiffs' inverse condemnation claim was time barred. *Walton*, 314 Or App at 126. Plaintiffs petitioned for review, which we allowed.

## II.   DISCUSSION

We begin our discussion, in Section A, with an overview of the relevant law: the law regarding a government's power of eminent domain; the state and federal constitutional limits on that power, specifically, Article I, section 18, and the Fifth Amendment, which require a government to pay "just compensation" for property that it takes through an exercise of the power of eminent domain; and the processes through which a property owner can obtain "just compensation." Then, in Section B, we apply that law to address plaintiffs' three alternative arguments for why their inverse condemnation claim is timely. For the reasons that we will explain, those arguments are unavailing. Inverse condemnation claims, including those based on "physical occupation" takings, can be subject to statutes of limitations, and plaintiffs' claim is subject to ORS 12.080(3), which establishes a six-year limitations period. That period began to run for plaintiffs' claim when the sewer lines were installed in 1995 and expired in 2001. Therefore, plaintiffs' 2017 complaint was untimely.

A.   *Relevant Law*

The state and federal governments have the power of eminent domain, which is the power to take private property for public use without the property owner's consent. *Dunn*, 355 Or at 346; *PennEast Pipeline Co. v. New Jersey*, 594 US 482, 487, 141 S Ct 2244, 210 L Ed 2d 624 (2021) ("Eminent domain is the power of the government to take property for public use without the consent of the owner."). "The power of eminent domain requires no grant of authority for its exercise, but instead is an inherent attribute of sovereignty." *Dunn*, 355 Or at 346; *Georgia v. Chattanooga*, 264 US 472, 480, 44 S Ct 369, 68 L Ed 796 (1924) ("The power of eminent domain is an attribute of sovereignty, and inheres in every independent State.").

The power of eminent domain is limited by the state and federal constitutions. Article I, section 18, and the Fifth

Amendment each provide that private property shall not be taken for public use without "just compensation." *Dunn*, 355 Or at 347; *United States v. Carmack*, 329 US 230, 241-42, 67 S Ct 252, 91 L Ed 209 (1946).

This case involves the physical occupation of property. A government can exercise its power of eminent domain to physically take property in two ways. *Dunn*, 355 Or at 347; *United States v. Dow*, 357 US 17, 21, 78 S Ct 1039, 2 L Ed 1109 (1958). It can initiate condemnation proceedings, through which the amount of compensation due to the owner is determined and a court order awarding the property to the government can be obtained, or it can physically occupy the property without a court order. *Dunn*, 355 Or at 347; *Dow*, 357 US at 21.

Usually, a government exercises its eminent domain power by initiating condemnation proceedings before taking property. *Dunn*, 355 Or at 347; *Cereghino et al v. State Highway Com.*, 230 Or 439, 443-44, 370 P2d 694 (1962) ("Ordinarily, when the state takes private property for a public use and it cannot agree with the owner on the value of the property, it institutes a condemnation proceeding in which the amount of just compensation is determined and a judgment therefor entered in favor of the property owner."); *First Lutheran Church v. Los Angeles County*, 482 US 304, 316, 107 S Ct 2378, 96 L Ed 2d 250 (1987) (observing that "the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain"). Such proceedings are sometimes referred to as "direct" condemnation proceedings. *Knick v. Township of Scott*, 588 US 180, 186, 139 S Ct 2162, 204 L Ed 2d 558 (2019).

In some circumstances, a government exercises its power of eminent domain by taking property without initiating condemnation proceedings. *Dunn*, 355 Or at 347 (explaining that the power of eminent domain can be exercised *de jure* or *de facto*). Those circumstances include, for example, circumstances where the government physically occupies property that it mistakenly believes that it owns and circumstances where the government's actions on its own property result in the "destruction, restriction, or interruption of the common and necessary use and enjoyment" of a neighboring

property. *Morrison v. Clackamas County*, 141 Or 564, 568, 18 P2d 814 (1933); *see, e.g.*, *Cereghino*, 230 Or at 443 (collection of surface water and dirt on the plaintiff's property caused by the state highway commission's relocation of a highway constituted a taking); *Morrison*, 141 Or at 569 (the plaintiff's complaint, alleging that the county's construction of a jetty diverted river flow onto the plaintiff's property, causing the property's "destruction," stated a cause of action for a taking).

When a government takes property without initiating a condemnation proceeding, the property owner can bring an inverse condemnation claim. "An 'inverse condemnation' claim is any claim against a governmental agency to recover the value of property taken by the agency although no formal exercise of the power of eminent domain has been completed by the taking agency." *West Linn Corporate Park v. City of West Linn*, 349 Or 58, 64, 240 P3d 29 (2010) (internal quotation marks omitted); *Knick*, 588 US at 186 (an inverse condemnation claim is a claim "'against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant'" (quoting *Clarke*, 445 US at 257)).

The term "inverse condemnation" is not a constitutional or statutory term. *Suess Builders*, 294 Or at 258 n 3; *Clarke*, 445 US at 257. Instead, it is a "popular" or "shorthand" description of a claim to recover the value of property that has been taken through an exercise of the power of eminent domain outside of a direct condemnation proceeding. *Thornburg v. Port of Portland*, 233 Or 178, 180 n 1, 376 P2d 100 (1963) ("Inverse condemnation is the popular description of a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency."); *Clarke*, 445 US at 257 (The term "'inverse condemnation' appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.").

"[I]nverse condemnation" simply describes a proceeding that "is the 'inverse' or 'reverse' of a condemnation

proceeding." *Clarke*, 445 US at 257; *see also City of Keizer v. Lake Labish Water Control Dist.*, 185 Or App 425, 429, 60 P3d 557 (2002). An inverse condemnation claim is denominated as "inverse" because "the taking occurs before the initiation of condemnation proceedings, which is the inverse of the ordinary sequence of events when a governmental entity exercises its power of eminent domain." *City of Keizer*, 185 Or App at 429. Thus, *condemnation proceedings* are brought by governmental entities before taking property, whereas *inverse condemnation proceedings* are brought by property owners after a governmental entity has taken property. The two types of proceedings differ both in who initiates them and when they are initiated.

"Actions to recover compensation for such a governmental taking long preceded the ['inverse condemnation'] label." *Suess Builders*, 294 Or at 258 n 3 (citing, *e.g.*, *Morrison*, 141 Or 564); *Morrison*, 141 Or at 575 (holding that, where county's construction of a jetty diverted river water onto the plaintiff's property, the plaintiff's complaint seeking "just compensation" under Article I, section 18, stated a cause of action).

A property owner can bring an inverse condemnation claim even if the legislature has not provided for such a claim. *Morrison*, 141 Or at 574. As this court has observed, "[i]t is the general rule, except where an exclusive remedy has been provided by statute, [that] the owner of property, appropriated or injured for a public use without just compensation having been made, may maintain an action at law for the damages sustained thereby." *Id*. Such an action is distinct from a tort action, from which a government may be immune. *Id*. ("We recognize the rule, \*\*\* that a county of the state of Oregon is not liable for ordinary torts or for the wrongful acts or omissions of its officers, servants, or employees unless made so by statute or some constitutional provision. But the present case [alleging flooding of the plaintiff's land], we think, plainly comes within the provisions of the constitution ordaining that private property shall not be taken for public use without just compensation and, therefore, the county is made liable." (Citations omitted.)).

An inverse condemnation claim may be brought against "the state itself" or "one of its lawfully constituted

agencies, such as a county, a school district, the State Fish and Game Commission, or the State Highway Department." *Tomasek v. Oregon Highway Com'n*, 196 Or 120, 147, 248 P2d 703 (1952); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 432 n 9, 102 S Ct 3164, 73 L Ed 2d 868 (1982) ("A permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant.").

"'Successful litigation [of an 'inverse condemnation' claim] against the governmental agency is a factual determination that there has been a 'taking' and in effect forces the governmental agency to purchase the interest taken.'" *Hawkins v. City of La Grande*, 315 Or 57, 67, 843 P2d 400 (1992) (quoting *Restatement (Second) of Property* § 8.1 comment d (1997)). "The dispositive issue, then, in an inverse condemnation claim is whether property was taken, in fact, by the government even though no formal eminent domain proceedings were initiated." *Dept. of Transportation v. Hewett Professional Group*, 321 Or 118, 131, 895 P2d 755 (1995) (italics omitted).

There is no unitary test for what constitutes a "taking" of property under either Article I, section 18, or the Fifth Amendment. *Dunn*, 355 Or at 348-49. Because of the "nearly infinite variety of ways in which government actions or regulations can affect property interests," there is "no magic formula" that "enables a court to judge, in every case, whether a given government interference with property is a taking." *Arkansas Game and Fish Comm'n v. United States*, 568 US 23, 31, 133 S Ct 511, 184 L Ed 2d 417 (2012). But all takings of property involve the appropriation of the property without the consent of the owner. *Dunn*, 355 Or at 346; *PennEast Pipeline Co.*, 594 US at 487.

Although there is no unitary test for what constitutes a taking, both this court and the United States Supreme Court have drawn some bright lines. This court has "consistently found a taking when government has intentionally authorized a physical occupation of private property that substantially has interfered with the owner's rights of exclusive possession and use." *Dunn*, 355 Or at 348 (so stating regarding Article I, section 18). Similarly, the Supreme

Court has ruled that "a permanent physical occupation of property authorized by the government is a taking." *Arkansas Game and Fish Comm'n*, 568 US at 31 (so ruling regarding the Fifth Amendment). Thus, "[i]f the nature of the governmental intrusion amounts to a 'permanent physical occupation of property,' the inquiry ends, regardless of 'whether the action achieves an important public benefit or has only minimal economic impact on the owner.'" *GTE Northwest, Inc. v. Public Utility Commission*, 321 Or 458, 469, 900 P2d 495 (1995) (quoting *Loretto*, 458 US at 434-35 (so ruling under the Fifth Amendment)); *see, e.g.*, *Loretto*, 458 US at 438 (holding that television company's installation of cable lines on the plaintiff's apartment building constituted a taking).[4]

A government can acquire private property for public use without "taking" the property, that is, without appropriating the property without the consent of the owner. For example, a government can negotiate with a property owner to purchase property, in which case the government has not "taken" the property because it has acquired the property with the owner's consent. *Woodward Lbr. Co. v. Un. Comp. Com.*, 173 Or 333, 338, 145 P2d 477 (1944) (holding that where property owner and federal government agreed upon purchase price and sale of property after the government threatened to exercise its power of eminent domain, the property was acquired by "purchase" and not by "eminent domain"); *see also In re Estate of Moore*, 190 Or 63, 67, 223 P2d 393 (1950) (rejecting argument that Article I, section 18, precludes the government's receipt of property by will or gift because Article I, section 18, applies only "to a 'taking' under the power of eminent domain, and has nothing whatever to do with taking of title to real property by devise"); *Janowsky v. U.S.*, 23 Cl Ct 706, 712-13 (1991), *rev'd and vac'd in part on other grounds*, 989 F2d 1203 (Fed Cir 1993) (collecting cases and observing that "when a citizen delivers property to the

---

[4] As explained, a permanent physical occupation of private property is a taking. The Court of Appeals has had the opportunity to apply that rule to the installation of sewer lines. *See Courter v. City of Portland*, 286 Or App 39, 48, 398 P3d 936 (2017) (stating that "if the city's pipes are occupying plaintiffs' property" outside the scope of the city's easement, "there has been a taking" for the purposes of Article I, section 18); *Ferguson v. City of Mill City*, 120 Or App 210, 214-15, 852 P2d 205 (1993) (holding that ordinance that required city property owners to grant city an easement for sewer lines and tanks was a taking for the purposes of Article I, section 18).

government pursuant to an agreement, an inverse condemnation claim does not arise simply because the government does not pay; the property owner's consent to the arrangement vitiates a claim that the government took the property for public use within the meaning of the Fifth Amendment"); *see, e.g., id.* at 711-12 (property owners' allegations that FBI breached an implied-in-fact contract to compensate owners for use of their property during an undercover investigation failed to state a claim for inverse condemnation because owners had freely agreed to allow the FBI to use their property; property owners' claim was contractual in nature). Thus, not all government acquisitions of property for a public use result from an exercise of the government's eminent domain power. Consequently, not all government acquisitions of property for a public use are subject to Article I, section 18, and the Fifth Amendment. To prevail on a takings claim, a plaintiff must show that their property was "taken," that is, that their property was appropriated for a public purpose through the exercise of eminent domain authority.

B.   *Responses to Plaintiffs' Arguments*

In this case, plaintiffs brought an inverse condemnation claim, and the issue on review is whether their claim is time barred. As mentioned, plaintiffs have made three alternative arguments regarding that issue: (1) inverse condemnation claims cannot be subject to statutes of limitations; (2) even if some types of inverse condemnation claims, like the "regulatory" takings claim at issue in *Suess Builders*, can be subject to statutes of limitations, "physical occupation" takings claims cannot; and (3) even if "physical occupation" takings claims can be subject to statutes of limitations and the six-year limitations period established by ORS 12.080(3) applies to them, the period does not begin until "the putative condemner refuses to pay just compensation after taking private property for a public use." We address those arguments in turn.[5]

_____

[5]  As recounted, in the trial court and Court of Appeals, plaintiffs made three arguments. We allowed review to address plaintiffs' third argument, relating to when an inverse condemnation claim accrues. However, because plaintiffs' three arguments are related and were fully litigated below, we address all three of them. *See* ORAP 9.20(2) (providing that the Oregon Supreme Court may consider issues that were before the Court of Appeals).

1.   *Whether inverse condemnation claims can be subject to statutes of limitations*

Plaintiffs' first argument is that inverse condemnation claims cannot be subject to statutes of limitations because they are constitutional claims. That argument is unavailing for three reasons: (1) both this court and the Supreme Court have already subjected takings claims to statutes of limitations; (2) Article I, section 18, is based on the Indiana Constitution's Takings Clause and, prior to the adoption of the Oregon Constitution, the Indiana Supreme Court had held that that clause could be subject to statutory requirements; and (3) this court has long held that Article I, section 18, claims can be subject to statutory limits.

First, plaintiffs' argument that, because state and federal takings claims are based on constitutional provisions, they cannot be subject to statutes of limitations, is at odds with decisions by this court and the Supreme Court. As mentioned, in *Suess Builders*, this court held that the six-year limitations period established by ORS 12.080(3) applied to a takings claim. *Suess Builders*, 294 Or at 268. Similarly, in *United States v. Dickinson*, 331 US 745, 747, 67 S Ct 1382, 91 L Ed 1789 (1947), the Supreme Court applied a six-year limitations period to the plaintiff's federal takings claim. *See* 28 USC § 1491(a)(1) (Court of Federal Claims has jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution" or any federal law, or for contract damages "in cases not sounding in tort"); *Knick*, 588 US at 189 (observing that 28 USC section 1491(a)(1) "provides the standard procedure" for bringing Fifth Amendment takings claims against the federal government); 28 USC § 2501 (claims brought under 28 USC section 1491(a)(1) are "barred unless the petition thereon is filed within six years after such claim first accrues").[6]

---

[6] We note that Congress has imposed statutes of limitations on other constitutional rights. *See* 28 USC § 2244(d)(1) ("A 1-year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court."); 28 USC § 2255(f) ("A 1-year period of limitation shall apply" to a motion to vacate, set aside, or correct a federal sentence by a person in federal custody.). The Oregon State Legislature has done the same. *See* ORS 147.515(1) ("A victim who wishes to allege a violation of a right granted to the victim in a criminal proceeding by Article I, section 42 or 43, of the Oregon Constitution, shall inform the court within 30 days of the date the victim knew or reasonably should have known of the facts supporting the allegation.").

Second, as to Article I, section 18, plaintiffs' argument is contradicted by a case decided by the Indiana Supreme Court, which construed the Takings Clause of the Indiana Constitution of 1851, on which Article I, section 18, was based: *New Albany & S.R. Co. v. Connelly*, 7 Ind 32 (1855), *overruled in part on other grounds by Graham v. Columbus & I.C. Ry. Co.*, 27 Ind 260 (1866). Because *New Albany* was decided before the adoption of the Oregon Constitution, it informs our construction of Article I, section 18. *Putnam v. Douglas Co.*, 6 Or 328, 331 (1877), *overruled in part on other grounds by State Highway Com. v. Bailey et al*, 212 Or 261, 319 P2d 906 (1957) ("The provisions contained in our constitution and statute in relation to the taking of private property for public use appear to have been taken from the Indiana Constitution and statute; and, having adopted them after they had been judicially construed by the courts of that state, it must be presumed that we adopted along with them the construction of those courts.").[7]

In *New Albany*, the Indiana Supreme Court held that a statute that prescribed procedures for bringing a claim for "just compensation" under the Indiana Constitution was enforceable, stating that "where the statute pointed out a special constitutional mode for the assessment of damages, in cases like the present, none but that mode could

---

[7] Indiana decisions that predate the adoption of Oregon's constitutional Takings Clause are relevant to our analysis because Article I, section 18—formerly Article I, section 19, under the Oregon Constitution of 1857—was derived from Article I, section 21, of the Indiana Constitution of 1851. Claudia Burton & Andrew Grade, *A Legislative History of the Oregon Constitution of 1857—Part I (Articles I & II)*, 37 Willamette L Rev 469, 486 (2001). *Compare* Or Const, Art I, § 19 (1857) ("Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in case of the State, without such compensation first assessed and tendered."), *with* Ind Const, Art I, § 21 (1851) ("No man's particular services shall be demanded without just compensation. No man's property shall be taken by law without just compensation; nor, except in case of the State, without such compensation first assessed and tendered.").

Article I, section 21, of the Indiana Constitution of 1851 was, in turn, an amended version of the takings provision contained in the Indiana Constitution of 1816. *See* Ind Const, Art I, § 7 (1816) ("[N]o man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives or without just compensation being made therefor."); *see also State v. Cookman*, 324 Or 19, 28, 920 P2d 1086 (1996) (relying on an Indiana Supreme Court decision construing the meaning of a clause in the Indiana Constitution of 1816 to inform the meaning of the parallel clause in the Oregon Constitution of 1857).

be adopted to recover them." 7 Ind at 35. In doing so, the Indiana Supreme Court relied on *Null v. White Water Valley Canal Co.*, 4 Ind 431 (1853), in which it had held that a property owner's claim for compensation under the Indiana Constitution of 1816 was time barred because it was not brought within a statutorily prescribed two-year limitations period. *New Albany*, 7 Ind at 35 (citing *Null*, 4 Ind 431).

In *Null*, the court held that the legislature "had power to enact" the statute of limitations and commented that "two years is a reasonable time for asserting a claim for damages [and] a party is not necessarily entitled to any more." 4 Ind at 435. Applying that conclusion, the court held that, if a claim "is not asserted in that time, it shall be disregarded." *Id*.

Thus, *New Albany* contradicts plaintiffs' argument that the legislature cannot impose statutory requirements—like limitations periods—on constitutional claims for "just compensation" under Article I, section 18. It shows that, prior to the adoption of the Oregon Constitution, the Indiana Supreme Court had held that the Indiana Constitution's Takings Clause on which the Oregon Constitution's Taking Clause was based could be subject to statutory requirements. *New Albany*, 7 Ind at 35; *see also Null*, 4 Ind at 435 (so holding under the Indiana Constitution of 1816); *Nelson v. Fleming*, 56 Ind 310, 321 (1877) ("[W]here a party whose land had been appropriated to the [state] failed to file his application for damages within the time thus limited, he must be regarded as having waived any claim for damages, and that upon the lapse of the time limited, no such claim for damages having been filed, the title to the land appropriated vested in the State as thoroughly and completely as if damages had been assessed and paid.").[8]

Third, also as to Article I, section 18, plaintiffs' argument that the legislature may not impose statutory requirements on constitutional takings claims is contrary to our cases holding that property owners seeking compensation

---

[8] Because *Nelson* was decided after the adoption of the Oregon Constitution, it is not evidence of the Oregon drafters' intent regarding Article I, section 18, but it confirms our understanding of *New Albany* and *Null*, which are relevant to the Oregon drafters' intent.

under Article I, section 18, must comply with statutes that prescribe the processes for obtaining such compensation. *Kendall v. Post*, 8 Or 141 (1879), is illustrative. In *Kendall*, a property owner sought compensation for rocks and stone that a county road supervisor had taken from the owner's land. *Id*. at 143-44. The road supervisor was authorized by statute to take private property for road building and repair. General Laws of Oregon, Crim Code, ch L, § 28, p 728 (Deady & Lane 1843-1872). If the road supervisor took a person's property, the person could seek compensation through a process prescribed by a statute, specifically, by making a written complaint "to the county court, at any regular meeting within six months after the cause of such complaint shall exist." *Kendall*, 8 Or at 145 (quoting General Laws of Oregon, Crim Code, ch L, § 29, p 729 (Deady & Lane 1843-1872)). The property owner argued that the statute was unconstitutional because it did not provide for a jury trial regarding the amount of compensation. *Id*. at 146. This court rejected that argument, distinguishing between claims for compensation under Article I, section 18, and civil claims, to which the Article I, section 17, right to a jury trial applies. *Id*. at 146. Regarding claims for compensation under Article I, section 18, this court held that, "in the absence of special provision in the organic law, giving the right to have a jury assess the damages, it is competent for the legislature to provide for assessments by any other just mode," and that, if the property owner "felt aggrieved by the acts of the supervisor, he should have applied to the county court, composed of the county judge and the county commissioners, while transacting the county business." *Id*. (internal quotation marks omitted); *see also Branson v. Gee*, 25 Or 462, 466-68, 36 P 527 (1894) (holding that, under Article I, section 18, the state could appropriate private property for public use "without compensation first assessed and tendered, but it must make provision by which the party whose property has been seized can obtain just compensation for it" and that property owner had to comply with statutory procedures for seeking compensation); *id*. at 467 (holding that statutory procedures did not violate federal Due Process Clause, even though the property owner bore the burden of initiating them); *Cherry v. Lane County*, 25 Or 487, 489, 36 P 531 (1894) (following *Branson*

and holding that property owner aggrieved by exercise of eminent domain had to submit their claim to the circuit court as required by statute). Thus, this court has long held that claims for compensation under Article I, section 18, may be subject to statutory requirements.[9]

### 2. *Whether "physical occupation" takings claims can be subject to statutes of limitations*

Plaintiffs' second argument is that, even if some types of takings claims—like the "regulatory" takings claim in *Suess Builders*—can be subject to a statute of limitations, "physical occupation" takings claims cannot. Plaintiffs are correct that *Suess Builders* addressed a "regulatory" takings claim; the issue was whether the defendants had taken the plaintiffs' property by designating part of it as the site of a future park. Plaintiffs are also correct that, under the law, "physical occupation" takings and "regulatory" takings are treated differently in some ways. For example, what a plaintiff must show to establish a "physical occupation" taking differs from what must be shown in a "regulatory" takings case. *See Hall v. Dept. of Transportation*, 355 Or 503, 511-12, 326 P3d 1165 (2014) (observing that, under Article I, section 18, a "physical occupation" taking results "when a governmental actor physically occupies private property or invades a private property right in a way that substantially interferes with the owner's use and enjoyment of the property, thereby reducing its value," and that a "regulatory" taking can result when (1) a government regulation "restricts a property owner's right of possession, enjoyment, and use," and that, as a result, "the property retains no economically viable or substantial beneficial use"; or (2) a government zoning or planning action reduces the property's value, and the property owner "'is precluded from all economically feasible private uses pending eventual taking for

---

[9] In arguing otherwise, plaintiffs rely on *Morrison* and *Tomasek*, but those cases are not on point. They did not involve whether the state may impose procedural requirements on takings claims. In *Morrison*, this court held that, although a county may be immune from tort liability, Article I, section 18, requires it to pay "just compensation" for property taken in an exercise of eminent domain. 141 Or at 574. In *Tomasek*, this court held that a property owner's constitutional right to "just compensation" does not depend on whether the state has failed or refused to institute direct condemnation proceedings; a property owner may bring an inverse condemnation claim. 196 Or at 147.

public use,'" or "'the designation results in such governmental intrusion as to inflict virtually irreversible damage.'" (quoting *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 614, 581 P2d 50 (1978))); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 US 302, 322-23, 122 S Ct 1465, 152 L Ed 2d 517 (2002) (observing that, under the Fifth Amendment, whether the government's physical occupation constitutes a taking "involves the straightforward application of *per se* rules," but whether the government's regulation constitutes a taking "'necessarily entails complex factual assessments of the purposes and economic effects'" (quoting *Yee v. Escondido*, 503 US 519, 523, 112 S Ct 1522, 118 L Ed 2d 153 (1992)). But plaintiffs are incorrect that "physical occupation" takings claims cannot be subject to statutes of limitations.

As noted, the Supreme Court has applied statutes of limitations to "physical occupation" takings claims. *Dickinson*, 331 US as 747.

As for Article I, section 18, as just discussed, prior to the adoption of the Oregon Constitution, the Indiana Supreme Court held that claims for "just compensation" could be subject to statutory requirements, including statutes of limitations. Those cases involved physical occupation and appropriation of private property for public use. In *New Albany*, the alleged taking was the construction of a railroad on the claimant's property, and, in *Null*, the alleged taking involved the construction of a canal through the plaintiffs' property and the diversion of the plaintiffs' water. *New Albany*, 7 Ind at 33; *Null*, 4 Ind at 432. Thus, prior to the adoption of the Oregon Constitution, the Indiana Supreme Court applied statutory requirements to "physical occupation" takings claims.

Similarly, the Oregon cases in which this court held that the plaintiffs had to comply with statutory requirements when seeking "just compensation" under Article I, section 18, include cases involving the physical appropriation of property. *Kendall* involved the removal of gravel and dirt from the plaintiff's property for road construction and repair, as did *Branson* and *Cherry*. *Kendall*, 8 Or at 143; *Branson*, 25 Or 462; *Cherry*, 25 Or at 488. In those cases,

property was literally taken by the government, and this court held that the property owners had to comply with the statutory procedures for seeking compensation.

In light of *Dickinson*, and the Indiana and Oregon cases upholding the application of statutory requirements on takings claims involving the physical occupation and appropriation of property, we reject plaintiffs' argument that such claims cannot be subject to statutes of limitations. Consequently, we conclude that ORS 12.080(3) applies to "physical occupation" takings claims.

3.  *Whether the limitations period on a takings claim does not begin to run until a government entity refuses or ignores a request for compensation*

Plaintiffs' third argument is that, even if takings claims based on the physical occupation of property can be subject to a statute of limitations, the limitations period does not begin to run "until the entity with the power of eminent domain refuses to pay or ignores a demand for compensation for what it took."

A limitations period begins to run when a claim accrues. ORS 12.010 (requiring actions to be commenced within limitations periods "after the cause of action shall have accrued"). Under Oregon law, the general rule is that a claim accrues when a plaintiff "has a right to sue on it." *Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 161, 742 P2d 1176 (1987). That is, a claim accrues when all the facts necessary to prove the claim exist. *U.S. Nat'l Bank v. Davies*, 274 Or 663, 666-67, 548 P2d 966 (quoting Michael Franks, *Limitation of Actions* 11 (1959)). Similarly, under federal law, a claim accrues when a plaintiff has "a complete and present cause of action," meaning that "the plaintiff can file suit and obtain relief." *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 US 192, 201, 118 S Ct 542, 139 L Ed 2d 553 (1997) (internal quotation marks omitted).[10] As we will explain, under both the state and federal constitutions, a property owner may

---

[10] In addition to the general rule, there is a discovery accrual rule, which applies to some claims. As discussed later in this opinion, we need not decide whether plaintiffs' inverse condemnation claim is subject to a discovery accrual rule. *See* 372 Or at 354 n 11.

bring a "physical occupation" takings claim when the physical occupation occurs. However, the reasons why an owner may bring such a claim at that point differ under state and federal law.

Under the Oregon Constitution, a property owner has a right to "just compensation," but not necessarily at the time that their property is taken. Again, Article I, section 18, provides, "[p]rivate property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered[.]" Thus, Article I, section 18, does not require the state to pay for property before taking it for a public use. Instead, as this court has explained, the state may appropriate property "without compensation being first assessed and tendered, but it must make provision by which the party whose property has been seized can obtain just compensation for it." *Branson*, 25 Or at 466; *see also Tomasek*, 196 Or at 147 ("[T]he assessment and tender of just compensation is not a condition precedent to a taking. The taking may occur and the amount of compensation be determined and paid later."); *Branson*, 25 Or at 467 (holding that statutes that established procedure for compensation after taking did not violate Article I, section 18, because the state "is not bound to make or tender compensation before [the] actual appropriation [of private property]," and the provisions of the statutes "afford[] an opportunity for the party aggrieved, whose property has been taken by the [state], to propound his claim for compensation").

The state can delegate its eminent domain authority to other governmental entities, and when it does, its delegates are also allowed to take property for public use without first paying "just compensation." *Baker County v. Benson*, 40 Or 207, 215, 66 P 815 (1901) ("When the property is taken directly by the state, or by any municipal corporation by state authority, it has been repeatedly held not to be essential to the validity of a law for the exercise of the right of eminent domain that it should provide for making compensation before the actual appropriation." (Internal quotation marks omitted.)).

An Article I, section 18, claim for "just compensation" from the state or other governmental entity is best understood as an assertion of a constitutional entitlement. An owner can bring such a claim as soon as their property is taken. As discussed above, the physical occupation of an owner's property constitutes a taking. The physical occupation triggers the entitlement to "just compensation" and provides the basis for a takings claim.

Plaintiffs argue that, before a property owner can bring a takings claim, the owner must request compensation and be denied. We find no legal support for that argument. The Indiana and Oregon cases that we have discussed indicate that, when an owner's property is taken, the owner can seek compensation. We see no reason why, as plaintiffs would have it, a property owner should be required to request compensation and be denied before being able to bring a takings claim to obtain that same compensation.

Plaintiffs appear to suggest that, because Article I, section 18, allows the state and other governmental entities to take property before paying "just compensation," a taking is not adverse to a property owner's interests until the owner requests and is denied compensation. That is incorrect. A "physical occupation" taking, like the one alleged here, is a substantial interference with an owner's "rights of exclusive possession and use." *Dunn*, 355 Or at 348; *Hall*, 355 Or at 511 (explaining that "a *de facto* taking results when a governmental actor physically occupies private property or invades a private property right in a way that substantially interferes with the owner's use and enjoyment of the property, thereby reducing its value"); *Tahoe-Sierra*, 535 US at 322-23 (explaining that a "categorical taking" results "[w]hen the government physically takes possession of an interest in property for some public purpose"). It is necessarily adverse. Therefore, we conclude that a property owner can bring a takings claim as soon as the state or other governmental entity physically occupies the owner's property.[11]

---

[11] It is possible that accrual of a "physical occupation" takings claim could be subject to a "discovery rule." Generally speaking, under a "discovery rule," a cause of action does not accrue "until the claim has been discovered or, in the exercise of reasonable care, should have been discovered." *FDIC v. Smith*, 328 Or 420, 428, 980 P2d 141 (1999). But we need not determine whether a "physical

We reach the same conclusion regarding takings claims under the Fifth Amendment, but for a different reason. Unlike Article I, section 18, the Fifth Amendment does not expressly provide that a government may take property before paying for it. And, in *Knick*, the Supreme Court recently held that, "because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit *at that time*." 588 US at 194 (emphasis added). Therefore, a property owner can bring a takings claim alleging a violation of the Fifth Amendment "as soon as the government takes [the property owner's] property without paying for it." *Id*. at 190.

Plaintiffs make two arguments against that conclusion. The first is based on a sentence in *Knick,* and the second is based on a subsequent Supreme Court case: *Cedar Point Nursery v. Hassid*, 549 US 139, 141 S Ct 2063, 210 L Ed 369 (2021). We address each of those arguments in turn.

First, plaintiffs point to a sentence in *Knick* in which the Court stated that its holding did not "as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation." 588 US at 202. The Court made that statement in response to a concern that its interpretation of the federal Takings Clause would prevent governments from taking necessary actions because property owners would be able to enjoin those actions. *Id*. at 201-02. In that context, the Court opined that, because "just compensation" remedies are generally available to property owners, there is, in most cases, "no basis to enjoin the government's action effecting a

---

occupation" takings claim is subject to a discovery rule because, in this case, there is no dispute that plaintiffs' father was aware of, or had reason to be aware of, the installation of the sewer lines by 1995.

Moreover, even if there was a dispute about whether plaintiffs' father was aware of, or had reason to be aware of, the installation of the sewer lines in 1995, plaintiffs themselves allege that their father entered into an agreement with defendants in 1998, and that allegation shows that their father knew about the lines by 1998. So, even assuming a discovery rule applies and that plaintiffs' father did not know, or have reason to know, of the sewer lines in 1995, plaintiffs' claim would have accrued in 1998, and the statute of limitations would have run by 2004, 13 years before plaintiffs filed their claim.

taking." *Id*. at 201. Therefore, the Court continued, as long as post-taking compensation is available, prospectively preventing the government from committing the violation in the first place is unwarranted. *Id*. at 202.

Contrary to plaintiffs' argument, the Court did not suggest that the reason the government may proceed with an uncompensated taking is because the availability of post-taking compensation prevents the taking from being unconstitutional; that is, it did not suggest that an uncompensated taking is not a constitutional violation unless and until post-taking compensation is denied. To the contrary, the Court explained that, "[g]iven the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate." *Id*. at 202. "But that is because * * * such a procedure is a remedy for a taking that violated the Constitution, *not because the availability of the procedure somehow prevented the violation from occurring in the first place*." *Id*. at 201 (emphasis added). To be clear, the Court stated, irrespective of the remedies available, "the violation is complete at the time of the taking," and "a property owner may bring a Fifth Amendment claim * * * at that time." *Id*. at 202. Thus, *Knick* does not support plaintiffs' position that a federal takings claim includes as an element a denial of requested compensation.

Plaintiffs' second argument is based on *Cedar Point Nursery*, which was decided two years after *Knick*. But, as we will explain, *Cedar Point Nursery* did not involve a question of when a property owner can bring a federal takings claim, and it did not cite *Knick*, much less address *Knick*'s holding regarding when a property owner may bring a such a claim. Moreover, unlike plaintiffs here, the petitioners in *Cedar Point Nursery* were not seeking compensation, they were seeking declaratory and injunctive relief from future entries onto their property.

In *Cedar Point Nursery*, a California regulation that took effect in 1975 required agricultural employers to permit union organizers onto their property "for up to three hours per day, 120 days per year." 594 US at 143; *see id*. at 166 (Breyer, J., dissenting) (noting that the access regulation was enacted in 1975). In 2015, union organizers

entered one petitioner's property under that regulation. *Cedar Point Nursery*, 594 US at 144-45. The union organizers also attempted to enter the other petitioner's property, but that petitioner blocked them from entering. *Id*. at 145. Believing that the union organizers would attempt to enter their properties again, the petitioners filed a claim against the California Agricultural Labor Board for declaratory and injunctive relief to prohibit the enforcement of the regulation against them, arguing that the access regulation effected a *per se* physical taking that violated the Fifth Amendment to the United States Constitution. *Id*. On review, the Court held that the access regulation effected a *per se* physical taking, reasoning that "[w]henever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Id*. at 149.

Plaintiffs point out that the access regulation that effected the taking in *Cedar Point Nursery* was enacted in 1975, but that the petitioners did not initiate their takings claim until 2015 upon the union workers' actual and attempted invasions pursuant to that regulation. That gap, plaintiffs reason, demonstrates that the petitioners' takings claim in that case could not have accrued at the time of the "taking" in 1975, because by 2015, a claim that accrued in 1975 would have been time barred. Thus, they maintain, *Cedar Point Nursery* demonstrates that "it was not the *taking* of the right to exclude that violated the Fifth Amendment— it was the non-payment of just compensation" that violated the Fifth Amendment and gave rise to an actionable takings claim in that case. (Emphasis in original.)

Contrary to plaintiffs' assertion, *Cedar Point Nursery* does not indicate that *Knick* is no longer good law. *Cedar Point Nursery* did not involve the issue whether the petitioners' claim in that case was time barred. As mentioned, the *Cedar Point Nursery* Court did not cite *Knick* or address *Knick*'s holding about when a takings claim is actionable. Moreover, *Cedar Point Nursery* did not involve a claim for "just compensation" based on past interference with the petitioners' property rights; instead, it involved claims for declaratory and injunctive relief. Plaintiffs seek a rule that a claim for "just compensation" does not accrue

unless and until the government refuses compensation. Nothing in *Cedar Point Nursery* indicates that the Court considered such a rule. Indeed, it does not appear that the petitioners in *Cedar Point Nursery* themselves complied with such a rule because there is no indication that the petitioners were denied any requested relief before they brought their takings claim in federal court. For all those reasons, we conclude that *Cedar Point Nursery* did not alter the *Knick* Court's holding regarding when a federal takings claim is actionable.[12]

## C. *Application of the Statute of Limitations to Plaintiffs' Claim*

Having concluded that takings claims under Article I, section 18, and the Fifth Amendment can be subject to statutes of limitations and that "physical occupation" takings claims can accrue when the physical occupation occurs, we apply those conclusions to the facts of this case. As recounted above, the summary judgment record, viewed in the light most favorable to plaintiffs, establishes that defendant installed the sewer lines by 1995 and that it did so for a public purpose and without the consent of plaintiffs' father, who owned the property at the time. Based on those facts, plaintiffs' father could have brought an inverse condemnation claim by 1995. Therefore, plaintiffs' claim accrued, and the six-year statute of limitations began running, in 1995. Because that period expired in 2001, plaintiffs' 2017 claim is time barred.

In arguing against that conclusion, plaintiffs rely on the 1998 agreement. They appear to contend that they had no basis for bringing their claim until defendant breached that agreement. There are two problems with that argument.

---

[12] That conclusion is supported by numerous federal court decisions issued since *Cedar Point Nursery* that have continued to apply *Knick* as good law. *See, e.g.*, *St. Maron Properties, L.L.C. v. City of Houston*, 78 F4th 754, 762 (5th Cir 2023); *Fox v. Saginaw County, Michigan*, 67 F4th 284, 290 (6th Cir 2023); *Beaver Street Investments v. Summit County, Ohio*, 65 F4th 822, 826-27 (6th Cir 2023); *Kreuziger v. Milwaukee County, Wisconsin*, 60 F4th 391, 394 (7th Cir 2023); *Bruce v. Ogden City Corp.*, 640 F Supp 3d 1150, 1161 (D Utah 2022), *aff'd*, No. 22-4114, 2023 WL 8300363 (10th Cir Dec 1, 2023); *Knight v. Richardson Bay Regional Agency*, 637 F Supp 3d 789, 798-99 (ND Cal 2022); *Vargo v. Barca*, No. 20-CV-1109-JDP, 2023 WL 6065599, * 4 (WD Wis Sept 18, 2023).

First, as just discussed, any takings claim based on the installation of the sewer lines accrued when defendant installed the lines, which was by 1995. At that point, plaintiffs' father could have initiated a takings claim. So, the 1998 agreement would matter only if it somehow tolled the running of the limitations period. But plaintiffs have not made a tolling argument. That is, they have not argued that, if their claim accrued in 1995, it was somehow tolled in 1998. They have argued only that their claim did not even accrue until 2014.

The second problem with plaintiffs' reliance on the 1998 agreement is that, if, as they have alleged, their father gave defendant an easement over the property in exchange for a free hook-up to the sewer system, then their father voluntarily transferred a property interest to defendant in exchange for a payment. And, if he did that, defendant's occupation of the property from the point of the agreement forward was not an exercise of defendant's eminent domain authority. Consequently, that occupation is not subject to Article I, section 18, or the Fifth Amendment. That is because, if a government acquires property as a result of an agreement, then it has acquired the property with the owner's consent. It has not exercised its eminent domain authority. *See Woodward Lbr. Co.*, 173 Or at 338 (transfer of property interest for agreed upon price was a purchase, not an exercise of eminent domain authority); *Janowsky*, 23 Cl Ct at 712 (property owner's claim that government breached contract to compensate owners for use of property sounded in contract, not the Takings Clause). Therefore, if defendant acquired plaintiffs' property pursuant to an agreement, its acquisition of the property is not subject to the constitutional limits on the exercise of eminent domain power, and it cannot be the basis for a takings claim under Article I, section 18, or the Fifth Amendment.

Plaintiffs are understandably concerned by what they believe to be defendant's breach of the 1998 agreement. The Court of Appeals addressed a similar concern in *City of Ashland v. Hoffarth*, 84 Or App 265, 733 P2d 925 (1987). In that case, the defendant brought a counterclaim for inverse condemnation against a city, alleging that he had dedicated a 20-foot strip of land to the city in exchange for a promise of

payment and that the city had failed to make the payment. *Id*. at 269. The defendant

> "alleged that he would not have dedicated the strip to the city had he known that he would not be reimbursed for it and that, as a result of the city's representation, the city obtained possession of the 20-foot-strip without providing just compensation."

*Id*. The Court of Appeals concluded that the defendant failed to state a claim for inverse condemnation because the city's actions did not constitute a taking. *Id*. at 270. The court explained that, at best, the

> "counterclaim alleges a promise by the city to pay for the strip in the future and his reliance on that promise. The mere fact that as a result of the promise the city now owns the strip and defendant has not been paid does not show that there was a 'taking.' Defendant's remedy, if any, was contractual."

*Id*. (citation omitted). We agree with the Court of Appeals' reasoning in *Hoffarth*. The defendant's concern related to the breach of an agreement; it was not a claim that his property had been taken without his consent. Consequently, he needed to bring a contract or quasi-contract claim, not an inverse condemnation claim.

The same is true here. Plaintiffs' concern is that, as a result of the 1998 agreement, they are entitled to a free sewer connection and that defendant has refused to provide them with that connection. That concern relates to the breach of an agreement. But, again, plaintiffs have not raised a breach of contract claim or a quasi-contract claim, which would have different accrual dates than their takings claim.

## III.   CONCLUSION

For the reasons explained above, we conclude that plaintiffs' inverse condemnation claim is subject to the six-year limitations period set out in ORS 12.080(3), that the limitations period began to run when defendant had installed the sewer lines, and that, because plaintiffs' claim was not filed within the limitations period, it is time barred.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.